UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

Kirti A. Mehta,

                Plaintiff

v.

Victoria Partners, et al.,

                Defendants

Case No. 2:21-cv-01493-CDS-VCF

**Order Granting Defendants' Motion to Dismiss**

[ECF Nos. 72, 73, 83, 84]

     Five years ago, Bruno Mars informed the world that "gold jewelry shining so bright; strawberry champagne on ice" were items he liked. Bruno Mars, That's What I Like (Atlantic Records 2017). Now, plaintiff Kirti A. Mehta alleges that defendants Park MGM, its corporate officers, and various other entities did some things that Mehta dislikes, including denying Mehta complimentary concert tickets to a Bruno Mars performance. *See generally* First Am. Compl., ECF No. 66. The defendants who have been served now move to dismiss Mehta's amended complaint, arguing that there is no legal basis on which to hold defendants liable for Mehta's personal predilections. *See generally* Mot. Dismiss, ECF No. 73. Because Mehta's amended complaint alleges no facts which could support a claim against any defendant and as further amendment would prove futile, I grant the served defendants' motion and dismiss them from the first amended complaint with prejudice, deny all other pending motions as moot, and warn Mehta that I will dismiss claims against the yet-unserved defendants without prejudice if he fails to show good cause for not serving them.

I.      Relevant Background Information[1]

   a. *Statement of Facts*

This lawsuit stems from two trips Mehta took to Las Vegas in March and July of 2021. Mehta stayed at the Park MGM beginning on March 16, 2021, and seemingly enjoyed his vacation until the night of March 18. ECF No. 66 at 9. On that day, Mehta, who "is not a regular drinker . . . and avoids drinks as much as possible" because he takes medication for his blood pressure, diabetes, and anxiety, imbibed six bottles of beer at the Tropicana Casino & Hotel pool. *Id.* at 10. He returned to the Park MGM and started playing slots at 6:00 p.m. *Id.* After losing his free play[2] and $3,500 in cash, Mehta went to the high-limit room. *Id.* Beginning at 8:00 p.m., Mehta hit a series of slot jackpots totaling approximately $62,000. *Id.* at 9. By 5:00 a.m. on March 19, Mehta "was holding . . . around $62,000 in winning[s] . . . in his sport coat." *Id.* At that point, Mehta consumed a six-pack of Heinekens within twenty minutes. *Id.* He has "no knowledge" of what came next and states that he "does not remember what happen[ed]." *Id.* at 9–10. Defendants state, and Mehta does not dispute, that "Mehta blacked out and put his winnings back into slot machines." ECF No. 73 at 6. At roughly 8:00 a.m., Mehta's wife found him, and they returned to Mehta's hotel room. ECF No. 66 at 10. Mehta then "rested for 24 [hours]." *Id.* Despite Mehta's claim that he is not a regular drinker, this was not the first occasion when Mehta blacked out and lost large sums of money at a casino. *See* ECF No. 66 at 11–12 (admitting a similar situation occurred in March 2020 at the Park MGM, in 2019 at the Mirage,

---

[1] Mehta names "MGM International, Inc." as a defendant in this case and references "MGM" several times throughout his first-amended complaint. *See generally* ECF No. 66. Defendants claim these entities do not exist but are named similarly to multiple entities affiliated with MGM Resorts International. ECF No. 73 at 3 n.1. Mehta is a pro se plaintiff, and "pro se pleadings must be construed liberally[.]" *Draper v. Rosario*, 836 F.3d 1072, 1080 (9th Cir. 2016). I do so here and thus consider Mehta's references to "MGM International, Inc." as references to "MGM Resorts International," and his references to "MGM" as either references to "Park MGM" or "MGM Resorts International" depending on the context.

[2] Free play refers to promotional casino chips or virtual currency awarded by a casino to a patron, often to entice the patron to the property. *See, e.g.*, *Harrah's Club v. State*, 659 P.2d 883, 885 (Nev. 1983) ("As part of their marketing and promotional activities, many casinos utilize gaming 'loss leaders' such as free slot play, promotional coupons or 'lucky bucks,' and free 'wheel of fortune' play. The casino patron has no 'stake' at risk in these promotional 'wagers,' as they cost the patron nothing.").

and "repeated[]" other times between 2005 and 2021 in multiple casinos across various states).

Upon waking, Mehta complained to multiple named defendants—including his host, Ryan Guadiz; Park MGM's then-president, Ann Hoff; and Park MGM's vice president of casino operations, London Swinney—that he had been overserved alcohol. ECF No. 66 at 10–11. After a few telephone conversations, Swinney offered Mehta two options: (1) he could accept $5,000 in free casino play to resolve his complaint, or (2) he could "pursue [his complaints to Swinney] from a legal standpoint" and "make a complaint with . . . the Nevada Gaming Control Board." ECF No. 66-1 at 10–11 (emails from Swinney). Mehta accepted the former offer and signed an agreement with defendant Joseph A. Corbo, Jr.—senior vice president and legal counsel acting as an authorized officer of MGM Resorts International—purporting to "release . . . *any* potential claim[s] [Mehta] had against the MGM parties and others" that "existed before June 7, 2021" in exchange for the $5,000 of free play. *Id.* at 13, 21–22. Mehta now challenges the validity of that agreement—even though he does not dispute signing it—because Swinney communicated the offer to him, but Corbo was the individual who signed the contract. ECF No. 66 at 15. However, Mehta has challenged the validity of the agreement only *after* accepting the Park MGM's offer of $5,000 in free play (plus a food-and-beverage credit of $500); returning to the Park MGM for a trip between July 1–5, 2021; and gambling away that $5,000. *Id.* at 14–16. He claims that upon his return to Las Vegas for that trip, he was deceived into spending his free play on slot machines that do not allow free play to trigger progressive jackpots (jackpots which grow over time in proportion to the amount of total amount of wagers placed on the machine). *Id.* at 16.

On July 2, 2021, Mehta alleges that he complained to Guadiz, whom Mehta overheard describing him as an "Indian free[-]loader" to another individual at the hotel. *Id.* at 17–18. The next day, Mehta requested three complimentary Bruno Mars concert tickets for a Fourth of July show at the Park MGM. *Id.* at 18. Mehta's request was denied because he did not "have enough play to qualify for comp[ed] tickets." *Id.* He alleges that "white players" received complimentary tickets to the Bruno Mars performance. *Id.* He does not describe further events from this trip. On

July 12, 2021, MGM sent Mehta a letter "regarding [his] dispute related to [his] gaming history with the MGM parties . . . in response to the various emails and the draft complaint [he] sent" following his Fourth of July trip. ECF No. 66-1 at 21–22. The letter explained MGM's bases for denying Mehta the complimentary Bruno Mars tickets, copied the release Mehta signed extinguishing his claims against the MGM defendants, and effectively banned Mehta from MGM properties. *Id.* Mehta claims that the letter was sent as retaliation for his legal demands. ECF No. 66 at 22–23.

      b. *Procedural History*

Mehta initiated this suit on August 11, 2021, against MGM Resorts International, Park MGM, various other subsidiaries of MGM Resorts International, and some of its corporate officers. ECF Nos. 1, 3. Most defendants, including Park MGM and the executives listed in the original complaint (the "original defendants"), waived service. ECF No. 6. However, MGM Resorts International did not. Review of the docket indicates that MGM Resorts International was never served with this lawsuit. I dismissed Mehta's original complaint, finding his causes of action insufficiently pled, but granted him leave to amend on September 2, 2022. ECF No. 61.

Mehta filed an amended complaint—now the operative pleading—on October 6, 2022, adding a host of additional executives from (seemingly arbitrary) MGM-affiliated casinos. ECF No. 66. As with MGM Resorts International, these newly added defendants have not been served with Mehta's lawsuit, nor have they waived service. The original defendants moved for reconsideration of my order granting Mehta leave to amend, arguing that amendment to the original complaint by adding new defendants would prove futile and unfairly prejudicial. ECF No. 72. The original defendants—the only entities upon which Mehta has effectuated service—now move to dismiss Mehta's first amended complaint. ECF No. 73. Mehta responded, ECF No. 76, and the original defendants replied, ECF No. 79.

Mehta moved for default judgment while the motion to dismiss was still pending. ECF No. 78. I denied that motion, finding that default judgment is inappropriate when, as here, all of

the served defendants have actually defended themselves in this suit. ECF No. 82. Mehta now moves for reconsideration of my order denying default judgment. ECF No. 84. He also moves for declaratory relief, requesting that I rescind the release agreement described *supra* page 3 and exclude it as admissible evidence from the remainder of this suit. *See* ECF No. 83 at 1–3, 6 (arguing that the contract should be declared null and void because it was not properly executed). The original defendants oppose both motions. ECF Nos. 85, 87.

II.      **Legal Standard**

Dismissal is appropriate under Rule 12(b)(6) when a pleader fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A pleading must give fair notice of a legally cognizable claim and the grounds on which it rests, and although a court must take all factual allegations as true, legal conclusions couched as factual allegations are insufficient. *Twombly*, 550 U.S. at 555. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard "asks for more than a sheer possibility that the defendant has acted unlawfully." *Id.*

"Generally, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion." *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990). "However, material which is properly submitted as part of a complaint may be considered." *Id.* Similarly, "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss" without converting the motion into one for summary judgment. *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994). On a motion to dismiss, a court may also take judicial notice of "matters of public record." *Mack v. S. Bay Beer*

*Distrib.*, 798 F.2d 1279, 1282 (9th Cir. 1986).

III.  Discussion

    a.  *Motion to Dismiss*

Mehta's lawsuit suffers from the fundamental problem that his first amended complaint describes no legal wrongdoing on the part of any defendant. He brings claims for (1) negligence against Park MGM and MGM Resorts International, (2) willful and wanton misconduct against all defendants, (3) national origin discrimination against MGM Resorts International, (4) disclosure violations and/or equal-access-of-information violations against MGM Resorts International, (5) retaliation against MGM Resorts International, and (6) emotional stress and distress against all defendants. ECF No. 66 at 8–24. His first, second, and sixth causes of action fail on their merits and have not remedied the defects that I identified in my prior order (ECF No. 61) when I dismissed Mehta's original complaint. I need not reach the merits of his third, fourth, or fifth causes of action (asserted against MGM Resorts International only) because Mehta has failed to serve MGM Resorts International altogether. I find that further amendment in this case would be futile and therefore dismiss Mehta's claims with prejudice. Finally, I deny the remaining pending motions in this case as moot.

    1.  *Mehta's Negligence Claim is Barred by the Economic Loss Doctrine*

I previously found that Mehta's original complaint may have stated a plausible case for negligence on its face, but I pointed out that the economic-loss doctrine precluded him from recovering his requested remedy of monetary damages. ECF No. 61 at 11–13. Mehta did not rectify this issue in his amended complaint. After reviewing Mehta's first-amended complaint, I conclude that he cannot make out a prima facie case for negligence and find that even if Mehta could plausibly plead a negligence claim, the economic-loss doctrine precludes recovery under that theory.

In Nevada, "to prevail on a negligence claim, a plaintiff must establish four elements: (1) the existence of a duty of care, (2) breach of that duty, (3) legal causation, and (4) damages." *Sanchez v. Wal-Mart Stores, Inc.*, 221 P.3d 1276, 1280 (Nev. 2009). The existence of a duty is "a question of law to be determined solely by the courts." *Turner v. Mandalay Sports Ent., LLC*, 180 P.3d 1172, 1177 (Nev. 2008). Generally, a premises owner or operator owes entrants a duty to exercise reasonable care. *Foster v. Costco Wholesale Corp.*, 291 P.3d 150, 152 (Nev. 2012). However, Mehta pleads no facts supporting his claim that the Park MGM or MGM Resorts International owed him a duty, let alone that they breached it. Even if Mehta's allegations that the Park MGM overserved him alcohol are true, "it is well settled in Nevada that commercial liquor vendors, including hotel proprietors, cannot be held liable for damages related to any injuries caused by the intoxicated patron, which are sustained by either the intoxicated patron or a third party." *Rodriguez v. Primadonna Co., LLC*, 216 P.3d 793, 798 (Nev. 2009) (citing *Hamm v. Carson City Nugget, Inc.*, 450 P.2d 358, 359 (Nev. 1969); *Snyder v. Viani*, 885 P.2d 610, 612–13 (Nev. 1994)). This is because "Nevada subscribes to the rationale underlying the nonliability principle—that individuals, drunk or sober, are responsible for their torts." *Id.* Because Mehta has not pled—and cannot plead—that the Park MGM owed a duty to Mehta, breached its duty, and caused Mehta damages, his claim for negligence cannot proceed. And even if I were to find that Mehta adequately pled negligence, he would still be barred from proceeding with that claim under the economic-loss doctrine.

"The economic[-]loss doctrine marks the fundamental boundary between contract law, which is designed to enforce the expectancy interests of the parties, and tort law, which imposes a duty of reasonable care and thereby encourages citizens to avoid causing physical harm to others." *Calloway v. City of Reno*, 993 P.2d 1259 (Nev. 2000) (citation omitted), *overruled on other grounds by Olson v. Richard*, 89 P.3d 31 (Nev. 2004). The economic-loss doctrine exists to prevent contract law from drowning in a "sea of tort." *East River S.S. Corp. v. Transamerica Delaval*, 476 U.S. 858, 866 (1986). It thus provides that certain economic losses are properly remediable

only in contract. *Giles v. Gen. Motors Acceptance Corp.*, 494 F.3d 865, 873 (9th Cir. 2007). The Nevada Supreme Court has applied this doctrine to negligence cases unrelated to products liability. *Id.* at 879 (collecting cases). The primary purpose of this doctrine is "to shield a defendant from unlimited liability for all of the economic consequences of a negligent act, particularly in a commercial or professional setting, and thus to keep the risk of liability reasonably calculable." *Terracon Consultants W., Inc. v. Mandalay Resort Grp.*, 206 P.3d 81, 86–87 (Nev. 2000) (en banc).

In Nevada, the doctrine bars unintentional tort claims when a plaintiff seeks to recover "purely economic losses." *Calloway*, 993 P.2d at 1259 (citations omitted). "Purely economic loss is a term of art that does not refer to all economic loss but only to economic loss not recoverable as damages in a normal contract suit." *Progressive Ins. Co. v. Sacramento Cnty. Coach Showcase*, 2009 WL 1871947, at *4 (D. Nev. June 29, 2009) (citing *Giles*, 494 F.3d at 877). Economic losses are not recoverable "absent personal injury or damage to property other than the defective entity itself." *Calloway*, 993 P.2d at 1267.

Mehta's negligence claim seeks the remedy of purely economic losses, but even accepting the allegations in Mehta's amended complaint as true, as I must, I find that Mehta has not pled any personal injury or damage to property which could support such a remedy. *See generally* ECF No. 66. He does allege that the March 18–19, 2021, beer-induced blackout "caused emotional and physical injury when it was combine[d] with [Mehta] taking his daily medicines," *id.* at 10, but he fails to describe what injury he suffered or how any defendant's negligence contributed to the injury. Fundamentally, Mehta seeks to recover gaming losses from his slot play at a casino via a negligence suit— but he has not cited any law, nor can I find any, indicating that such an action is viable. I thus dismiss his first cause of action.

       2.   *Mehta Has Not Plausibly Pled Willful and Wanton Misconduct or Fraud*

Mehta's second claim for relief, titled "willful & wanton misconduct," alleges that the original defendants "attempt[ed] . . . to deceive and cheat" him in a variety of manners. ECF No. 66 at 15. Defendants claim that neither Nevada nor federal law recognize a standalone cause of

action for willful and wanton misconduct but agree that "[t]he label that a plaintiff places on his pleadings . . . does not determine the nature of his cause of action." *Johnson v. United States*, 547 F.2d 688, 691 (D.C. Cir. 1976); *Rains v. Criterion Sys.*, 80 F.3d 339, 343 n.2 (9th Cir. 1996). Nonetheless, according to Nevada law, willful misconduct in other contexts is "intentional wrongful conduct, done either with knowledge that serious injury to another will probably result, or with a wanton or reckless disregard of the possible results." *Davies v. Butler*, 602 P.2d 605 (Nev. 1979); *see also Van Cleave v. Kietz-Mill Minit Mart*, 633 P.2d 1220 (Nev. 1981) (defining willful misconduct as an act "that the actor knows, or should know, will very probably cause harm" (quotations and citations omitted)); *Bell v. Alpha Tau Omega Fraternity*, 642 P.2d 161 (Nev. 1982) (stating that willful misconduct "requires a consciousness that one's conduct will very probably result in injury").

   Mehta's cause of action for willful and wanton misconduct could be construed as either a claim for aggravated or gross negligence or for fraud. For his part, Mehta seems to agree that his own allegation sounds in fraud. *See* Pl's Reply Br., ECF No. 76-1 at 2 (alleging that Swinney and other MGM executives "deceptively . . . committed fraud of will full [*sic*] wanton misconduct"). Furthermore, the substance of his specific allegations requires me to conclude that he meant to charge the defendants with fraud, and I thus analyze this cause of action as such.

   First, Mehta alleges that the parties (i.e., himself and Corbo) to the release agreement did not actually witness each other sign the contract, as they instead circulated the document electronically to have parties sign it on their own. *Id.* This allegation appears to stem from either a misinterpretation or confusion regarding the language above the signatory page of the release agreement which states, "IN WITNESS WHEREOF, the Parties hereby execute this Agreement." ECF No. 66-1 at 13. He also alleges that Corbo's signature on the release agreement renders the agreement invalid, as he negotiated the agreement with Swinney, not Corbo. ECF No. 66 at 14–15.

Second, Mehta alleges that MGM Resorts International's offer of $5,000 free play was "designed to lie, cheat[,] and deceive players who come to play [at] MGM casinos" because the free play was not eligible for certain progressive slot jackpots. *Id.* at 15. Mehta played $4,300 of his $5,000 in free play on machines with such progressive jackpots. *Id.* at 16 ("Mehta played . . . [a] $100 denomination slot machine in [a] high[-]limit area, where [the] machine sticker said, free play is not allowed . . . and [it] took $4300 free play without any bonus spin [*i.e.*, it did not award Mehta an opportunity to win the progressive jackpot]."). Contradicting Mehta's claim of deception are Mehta's own admissions, *see id.* at 15–16 ("Mehta played . . . [a] slot machine in [the] high[-]limit area, where [a] machine sticker said" free play was not allowed), and his own photographs, which he attached as exhibits to his first amended complaint. *See* ECF No. 66-1 at 15–17 (zoomed-in photo states "FREE PLAY Not Available" on the left-hand exterior of the slot, above where Mehta would have inserted his player's card).

The elements of fraud under Nevada law require a plaintiff to plead (1) a false representation made by the defendant; (2) the defendant's knowledge or belief that the representation was false, or the defendant's insufficient basis for making the representation; (3) the defendant's intention to induce the plaintiff to act or refrain from acting in reliance upon the misrepresentation; (4) plaintiff's justifiable reliance upon the misrepresentation; and (5) damage resulting from such reliance. *Bulbman, Inc. v. Nev. Bell*, 825 P.2d 588, 592 (Nev. 1992). The Federal Rules of Civil Procedure further heighten the pleading requirement for fraud, demanding that a plaintiff "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

Mehta cannot meet his pleading burden for fraud. Even if the boilerplate "in witness thereof" language on the signature page to the release agreement were a clause requiring each signatory to witness each other's signatures, Mehta does not explain how Carbo's signature induced his own reliance on the signature or what the resulting damages were. Furthermore, Corbo's signature on the agreement rather than Swinney's does not constitute a fraudulent

"misrepresentation" because nothing in the agreement states that Swinney would be the signatory—the contract required only that an authorized officer of MGM Resorts International sign the page. *See* ECF No. 66-1 at 13 (no mention of a specific signatory). Nowhere does Mehta allege that Corbo was not authorized to sign on behalf of MGM Resorts International.

As for Mehta's allegations regarding the free play and the limitations about how it could be redeemed, he cannot demonstrate that any misrepresentation occurred. His claim that he was "deceived" is not plausible given the fact that the machine he played on and took a photograph of explicitly mentions, "FREE PLAY Not Available" on its exterior. *Id.* at 15–17. Mehta does not state that anybody lied to him or otherwise contradicted the placard on the machine, that anyone knowingly misrepresented the availability of free-play jackpots, or that he relied upon such a misrepresentation. *See generally* ECF No. 66. Because Mehta's claim for willful and wanton misconduct sounds in fraud and he cannot meet the heightened pleading burden for fraud, I dismiss his second cause of action.

### 3. Mehta's Claim for Violations of NRS Chapter 463 Fails Because There is No Private Right of Action for Gaming Violations

Mehta also brings a claim for violations of Nevada's gaming regulations and statutes. ECF No. 66 at 14–16. While this appears to be intermingled with his fraud claim, I address it separately because no private cause of action exists for gaming violations, and thus Mehta's claim is not viable. The Supreme Court of Nevada has long held that "the legislature vested authority for enforcement of Chapter 463 [Nevada's statutes pertaining to licensing and control of gaming] in the Nevada Gaming Control Board and the Nevada Gaming Commission." *Sports Form v. Leroy's Horse & Sports Place*, 823 P.2d 901, 904 (Nev. 1992). "Therefore, absent express language to the contrary, the legislative scheme of Chapter 463 precludes a private cause of action." *Id.* Mehta cannot identify a specific statute that permits him to bring a cause of action for gaming violations. He references "NRS 465.070" in his reply brief when discussing "gaming fraud" but NRS 465.070 simply describes the elements of gaming fraud. *See generally* NRS

465.070. It does not permit an individual, like Mehta, to assert gaming violations via a lawsuit. *Id.* As a result, Mehta's claim for violations of the gaming control regulations must be dismissed.

        4.   *Mehta's Claim for Emotional Stress and Distress Does Not Have a Remedy in Law*

Mehta's final claim for relief alleges that he has lost sleep, gets more frequent anxiety attacks, and experienced financial issues to the point where he has "become financially broke" because of the defendants' actions. ECF No. 66 at 24. A showing of emotional distress may satisfy the damages element in some circumstances. *S. Nev. Adult Mental Health Servs. v. Brown*, 498 P.3d 1278 (Nev. 2021) (table) (recognizing that the negligent infliction of emotional distress can be an element of the damage sustained by the negligent acts committed against the plaintiff) (internal citations omitted). However, "emotional distress" does not stand alone as a cause of action, and Mehta has not identified authority permitting him to bring such a claim. To the extent that Mehta pleads damages resulting from emotional distress as part of his other causes of action (*i.e.*, his negligence- or fraud-based claims), those other causes of action have failed to survive dismissal. Consequently, Mehta's claim for emotional stress and distress must be dismissed as well.

        5.   *Mehta's Claims against Unserved Defendants*

I sua sponte address the issue of the unserved defendants who remain in this lawsuit: Travis Lunn, Niklas Rytterstrom, Brandon Dardeau, Clive Hawkins, Chuck Bowling, and Anton Nikodemus. *See* ECF No. 66 (adding these defendants as part of the first-amended complaint). The Federal Rules of Civil Procedure provide that "[i]f a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time." Fed. R. Civ. P. 4(m). The court may extend the time for service if the plaintiff shows good cause. *Id.* Based on Mehta's continued failure to effect service on the newly added defendants, dismissal of these unserved defendants appears to be warranted. *Patrick v. McDermott*, 2019 WL 10255472, at *13 (C.D. Cal. June 24, 2019). Consequently, this order constitutes notice

to Mehta under Rule 4(m) that unless he shows good cause for the failure to serve these six "new" defendants, I will dismiss without prejudice this action against them. In addition, although the unserved defendants are listed in the caption of the amended complaint, they are not mentioned or referenced anywhere in Mehta's statement of facts or the recitations of his causes of action. *See generally* ECF No. 66. Therefore, dismissal of the unserved defendants for Mehta's failure to state any claims against them also appears to be warranted, as it is not clear from the face of his complaint how, if at all, these defendants are involved in this lawsuit.

No later than February 17, 2023, Mehta is ordered to file a response addressing his failure to serve the newly added defendants and whether (and how) there exists good cause for further extending the service deadline. He must also show cause why the newly added defendants should not be dismissed for his failure to state claims against them. If Mehta fails to file an adequate response by February 17, 2023, I will dismiss this action without prejudice as to the unserved defendants. As no claims or defendants will remain, I will order this case be closed on that date.

### 6. *Amendment of the Complaint Would Prove Futile*

After a party has amended a pleading once as a matter of course, it may only amend further after obtaining the court's leave or the adverse party's consent. Fed. R. Civ. P. 15(a). Generally, Rule 15 advises that "leave shall be freely given when justice so requires." *Id.* This policy is "to be applied with extreme liberality." *Owens v. Kaiser Found. Health Plan, Inc.*, 224 F.3d 708, 712 (9th Cir. 2001) (internal quotation omitted). District courts, when deciding whether to grant leave to amend, should consider "undue delay, bad faith[,] or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Foman v. Davis*, 371 U.S. 178, 182 (1962). It is the "consideration of prejudice to the opposing party that carries the greatest weight." *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). Dismissal with prejudice and without leave to amend is inappropriate unless it is

clear that the complaint could not be saved by amendment. *Id.*

I have thoroughly considered the *Foman* factors and find that further amendment would be both futile and unduly prejudicial to the original defendants to this case. A claim is considered futile—and leave to amend to add to it shall thus not be given—if "there is no set of facts which can be proved under the amendment which would constitute a valid claim or defense." *Netbula, LLC v. Distinct Corp.*, 212 F.R.D. 534, 538–39 (N.D. Cal. 2003) (citing *Miller v. Rykoff-Sexton*, 845 F.2d 209, 214 (9th Cir. 1988)). There is no set of facts that can support Mehta's claim for negligence, as his damages are strictly economic in nature and are thus precluded by the economic-loss doctrine. There is no set of facts that can support Mehta's claim for willful and wanton misconduct, as Mehta has explicitly contradicted his own assertion of misrepresentation by providing evidence proving that the MGM defendants did not mislead him. There is no set of facts that could support Mehta's claim for gaming regulation violations, as violations of NRS Chapter 645 do not permit private causes of action. And finally, there is no set of facts that could support Mehta's isolated cause of action for emotional distress, as neither Nevada law nor federal law recognize emotional distress as a standalone claim.

Consequently, amendment of any of Mehta's claims would be futile. Allowing Mehta to continue this litigation against the original defendants would serve only to tether those individuals and entities to a lawsuit with no possibility of success on the merits. Because justice does not so require further amendment in this case, I dismiss Mehta's claims against the original defendants with prejudice.

    b. *Other Pending Motions*

Having dismissed Mehta's claims against the original defendants with prejudice, I order that all other pending motions brought by and against the original defendants are now moot. The original defendants move for reconsideration of my prior order permitting Mehta to amend his original complaint. ECF No. 72. Mehta also requests declaratory relief (ECF No. 83) and reconsideration of my order denying his motion for default judgment (ECF No. 84). The

declaratory relief he seeks is moot as I have no basis for rescinding the release agreement. And the default judgment he seeks is moot as I have no basis for issuing a default judgment against parties who have been served, participated in the lawsuit, and are now being dismissed from it.

IV.     Conclusion

IT IS HEREBY ORDERED that defendants' motion to dismiss **(ECF No. 73)** is **GRANTED**.

IT IS FURTHER ORDERED that the other motions pending in this case **(ECF Nos. 72, 83, 84)** are **DENIED as moot.**

IT IS FURTHER ORDERED that plaintiff must file, **no later than February 17, 2023**, a response explaining his failure to serve the newly added defendants and addressing whether and how there exists good cause for further extending the time for service. He must also show cause why the newly added defendants should not also be dismissed for Mehta's failure to state claims against them.

DATED: January 17, 2023

_____
Cristina D. Silva
United States District Judge